NEW JERSEY DEPARTMENT OF LABOR,
WORKMEN'S COMPENSATION BUREAU.

MORRIS HOCHBERG, PETITIONER, v. BOROUGH OF
BELMAR, RESPONDENT.

ANNIE HOCHBERG, PETITIONER, v. BOROUGH OF
BELMAR, RESPONDENT.

Decided October 18, 1944.

For the petitioner, *Abraham Klitzman.*

For the respondent, *Edwin Joseph O'Brien.*

Petitioner in the original petition having died on December 22d, 1942, a petition was filed by the widow, through the same attorney, Abraham Klitzman, Esquire, with the notation in answer to question 34 of the petition "there is presently pending in this Bureau a formal petition for compensation filed on September 19th, 1942, to which an answer has been filed and which case is presently pending with this department. Since the filing of this petition the petitioner has died and accordingly the within petition is being filed as an amended petition." In this "amended petition" there is the allegation "decedent was prostrated by sunstroke and as a result aggravated an existing heart condition."

The matter came on for a hearing before me, a Deputy Commissioner of the Workmen's Compensation Bureau,

Department of Labor of New Jersey, at the Asbury Park District Court room, Electric Building, on a number of occasions and was finally tried and disposed of on the following dates: July 7th, 1944, August 14th, 1944, and September 8th, 1944, the attorneys representing the petitioner and respondent being present and trying the matter. The two petitions were tried together by consent.

Petitioner produced one William Martin, Jr., meteorologist, in charge of the Long Branch station. He testified that the average mean temperature for Sunday, July 19th, 1942, the date on which it is alleged the "sunstroke" took place, was 82 degrees; humidity ranging from 69 per cent. at ten A. M. to 86 per cent. at nine P. M.; that it was a clear sunshiny day, southerly wind with a maximum velocity of thirteen miles per hour.

Dr. Joseph H. Bryan was the next witness produced by the petitioner. He said he had been practicing for over forty years in general practice; that he had known the decedent for probably twenty years and that he was the physician for the widow for several years. He stated he never made a very careful examination of decedent but knew that he had a weak heart. In fact his heart condition had been such for many years, that he had to have positions where he did not have any exercise. "I recommended that he did not get any position which required very much physical effort on his part." This doctor stated that he had been in this condition for at least ten years prior to 1942 and that decedent was suffering from a myocarditis.

William J. Briden was the next witness produced on behalf of the petitioner and he testified that he was a sergeant of police, in charge of the gatemen of the Borough of Belmar. He stated that on July 19th, which was a hot day, he saw the decedent at about five minutes after nine A. M. right at the decedent's gate and saw him several times during the day, the last time at about quarter after five. Decedent was carrying out his assigned duty of collecting the tickets at the gate. Decedent did not return the next morning to work so the witness went down to his house to see him and found him in bed. Decedent never returned to work after that. The wit-

ness stated he was told by the family that decedent had pneumonia, and he was never told by the family that decedent had suffered from the heat, or was ill because of the heat, or had suffered any accident.

On cross-examination this witness admitted that the decedent's only duties were to collect the tickets and that he could sit down or stand up, as he chose, that he had a sun helmet on and an umbrella. He stated that decedent never complained to him about suffering from the heat on this day or about having sustained any accident. He further testified there was no exertion to this job which decedent did.

Dr. Adam Downey Osborn was the next witness produced on behalf of the petitioner and testified that he has been practicing since 1936 in general practice with a leaning toward allergy. He stated he knew the decedent and was called in to see the decedent's wife sometime shortly after Dr. Bernstein left for service in the United States Army, sometime in June, 1942. This witness did not treat the decedent until July 19th, 1942, which he said was a very hot day. Decedent was complaining of shortness of breath, weakness, and pains in his chest, the pain was all over his chest and he was in a state of collapse, cold sweat, temperature of 103.4 and pulse around 120 with a respiration at 30, and a blood pressure of 112/90, and his chest was full of rales. The doctor first saw him in the evening of July 19th, 1942, and he testified that he was a very sick man. He prescribed codein and an ice cap. When he saw him again, around eleven o'clock that evening, his temperature was down to 102 but his condition was about the same, his pulse was 100, his respiration 23 and 24. The doctor felt that he had a lobar pneumonia and prescribed sulfa thysol. He went to the hospital Tuesday. X-rays were taken on the 25th of July and this doctor sent him to the hospital with a diagnosis of lobar pneumonia. This witness saw the decedent until he died, on December 21st, at which time he died of a coronary occlusion in the opinion of this witness.

This witness' opinion was that the decedent "probably started off with heat exhaustion." This witness admitted that he did not know anything about the fact that decedent had

difficulty the evening before in the abdominal and pectoral region and had started for work the morning of the 19th of July feeling weak and with the belief that he had indigestion.

Gertrude Briers was the next witness produced by the petitioner, and testified that she was a police woman in the Borough of Belmar and that she saw the decedent on the 19th of July, 1942, that his face was flushed at one time. She said he never complained to her about the heat of the day or of being sick because of the heat. He did complain he did not feel well, as he had done on several occasions. There is no exertion to his work, she admitted.

Pauline Ruth Asch, the decedent's daughter, was the next witness produced on behalf of the petitioner and she testified to the apparent health of her father before July 19th, 1942, and that she saw him on that morning dressed to go to his job when he brought her the rolls and bread, and that he was in a hurry, and he said "he was going to work; it is late." She saw him about seven P. M. on a couch in his house and he appeared red and hot and was perspiring. He had a hard time getting his breath and he was rubbing his chest. She followed the course of his illness from that time on up until he died. She said she did not go personally to the borough and tell them about her father's alleged heatstroke or sunstroke and did not know anything about any form being sent from the insurance company to her mother.

Dr. Julius Bernstein was the next witness produced on behalf of the petitioner, and testified that he has been practicing since 1937 and specializing in internal medicine.

While he testified he thought there was a causal relationship, based on the hypothetical question, which hypothetical question contained the allegation that the decedent left the house that morning feeling perfectly well, nothing was said about his so-called "indigestion" the night before and the fact that he left home that morning still complaining of discomfort and feeling weak. This doctor admitted on cross-examination that with the history as related by the widow it was entirely possible that decedent had the beginning of this coronary occlusion the night before, to wit, July 18th. He also admitted that with the weather as it was he might have

suffered the occlusion on his own porch or in his own home at any time during that warm period. He admitted that a man in decedent's condition, coronary occlusion could have occurred at any time or in any place.

Dr. Louis F. Allbright was the next witness produced by the petitioner, and testified he had been practicing as a specialist in cardiology and is a registered internist. He saw the decedent on July 21st, 1942, for the first time. Decedent was extremely short of breath, was unable to lie flat in bed, his lips were blue, chest filled with loose rales; the heart sounds were of very poor quality, the pulse rate rapid, blood pressure was around 130 systolic, neither significantly raised nor lowered. "There was some question in our minds when I first saw him whether he might have had pneumonia or whether it was entirely his heart."

An electrocardiogram taken several days later showed that he had a coronary occlusion. In the opinion of this doctor excessive heat is a contributing factor in producing a coronary occlusion. He based his opinion, in answer to the hypothetical question, on the statement that the decedent left for work that morning feeling perfectly well, and without any mention of symptoms of discomfort he had the night before and on the morning in question. He did admit, however, that the "onset occurred when the man had his first precordial pain." He believed this decedent probably had some degree of heatstroke plus coronary occlusion. His differentiation between heatstroke and heat exhaustion was that in the latter condition the complaints are in a more chronic form, although of the same nature! He admitted that the coronary occlusion might have been due to the natural progress of the disease. He admitted that it is unusual to have a high temperature of 103 plus on the same day that the occlusion occurs though it is sometimes seen. Usually, he admitted, the temperature does not rise to that point until from twenty-four to seventy-two hours after the occlusion takes place. Of course this witness did not see the decedent until over forty-eight hours after the attack from which decedent suffered. The temperature of 103 plus was taken approximately 24 hours after the onset of the precordial pain on the evening of July 18th, 1944.

The testimony of the widow, taken *de bene esse* was offered in evidence by the petitioner's attorney and entered in evidence. She testified that on the evening of July 19th she saw decedent coming home "walking slowly." When he got into the house he fell and she helped him to a couch, she stated decedent was hot and his body felt hot. She testified that the night before decedent was not feeling well, that he was feeling tired, suffering with what she thought was indigestion and when he went to work the next day he felt weak. She testified that the only work that decedent did other than the summer job of collecting tickets, was a watchman's job at Braid Company. On the evening of the 18th of July decedent complained of feeling tired and he complained of trouble or discomfort in the upper part of the chest. After eating his dinner on the evening of July 18th, "he complained of feeling tired and of a pain in his chest." In reference to the testimony of this witness the attorney for the respondent moved to have the hearsay and occlusion testimony stricken from the record as though motion had been renewed.

At this point the petitioner rested.

The respondent produced as its first witness Dr. Jerome Kaufman, whose qualifications as a cardiologist were stated for the record. He testified there was no causal relationship between the employment or anything in connection with the employment and his illness on July 19th, 1942, followed by his death in December, 1942. He stated that undoubtedly the coronary occlusion started the night of July 18th, when he had precordial pains and it was a continuous process, not in any way affected by his employment. He stated that the temperature of 103.4 was due to the myocardial infarction (destruction of heart tissue) which appeared. as it almost invariably does, from twenty-four to seventy-two hours after the onset of the occlusion. There was no doubt in his mind that the man's illness and death followed the classical or typical picture of a coronary occlusion progressing naturally from conditions existing in this decedent's heart and blood vessels on and prior to July 19th. He further stated there was nothing in the evidence to show that the petitioner had suffered with either heat exhaustion, heatstroke or sunstroke

whatsoever, but that the condition from which he suffered was undoubtedly coronary occlusion with resulting infarction of the tissues due to the shutting off of the blood supply to the heart.

Dr. George Olcott was the next witness produced on behalf of the respondent, and he testified that there was no relationship whatsoever between the decedent's employment and his illness on July 19th followed by his death in December, 1942. He testified in a similar vein to Dr. Kaufman, stating that there was no evidence that decedent had suffered from either heat exhaustion or a sunstroke. He, like Dr. Kaufman, testified that if the decedent had suffered a heat or sunstroke he would have collapsed on the job and would have had to be carried home. He further stated that the picture of decedent was the typical or classical picture of a coronary occlusion with resulting infarction, progressing normally to its final termination, not affected in anyway by either heat or employment.

At this point the respondent rested.

After listening to all the testimony and considering all the evidence in the case, I am of the opinion and I do so find that the petitioner has failed to sustain the burden of proving the allegations in his petitions that decedent was "taken suddenly ill with a sunstroke," or that decedent "was prostrated by sunstroke." There is no evidence that the decedent complained to anyone on the job of suffering from the sun or from excessive heat. He apparently continued doing his work which did not require any significant exertion or effort, and when he was finished he walked home. There was no evidence of collapse on the job, as would have occurred if he suffered from a sunstroke or heatstroke, according to the weight of the credible evidence in the case.

If we are to consider heat exhaustion there is nothing in the case to show that the decedent was exposed to such heat exhaustion on his job any more than in his home or on his way to or from his home.

If we are to believe the testimony of the petitioner the weather had been hot for a week or so prior to the 19th and the heat continued for twenty-four hours a day. On his job

decedent was furnished with a chair at the gate in which to sit and he wore a sun helmet and had an umbrella at the gate to shield him from the sun. Was he exposed to any greater, if as great, hazard or risk than the rest of the community? Wasn't he, in fact, subject to less of a hazard because of his exposure to the breezes and his protection from the sun by the umbrella and sun helmet, as well as the accessibility of the chair provided for his use? Wherein was the heat, if we are to consider heat exhaustion, greater where he worked than in his home? There was no prostration on the job, no claim of being affected by the heat on the job; decedent said nothing to any of the witnesses on the job who were produced by the petitioner as witnesses, about suffering from the heat or the sun and admittedly the picture of the decedent's condition is typical of what occurs when a man with a diseased heart and coronary vessels meets with an occlusion which invariably occurs sooner or later with the normal and natural progress of the disease. Every item presented in the petitioner's case is in conformity with the natural progress of the coronary occlusion and resulting infarction and in no manner does it portray any occurrence of a heat or sunstroke. Furthermore, even by the admission of the petitioner's experts, the pain in the chest and the weakness and discomfort suffered by the decedent at home on the evening of July 18th were the onset or prodromal symptoms of precordial pain signifying the beginning of the end in the long chain of cardial vascular degeneration resulting in the closing off of the vessels nourishing the heart, the massive impairment of the nourishment to the heart and the resulting death of tissue, or infarction, which is the inevitable result.

In this posture of affairs we have the onset of the precordial pain, or prodromal symptoms, which occurred in the Schlegel case (*Schlegel* v. *H. Baron*, 130 *N. J. L.* 611; 34 *Atl. Rep.* (*2d*) 132) prior to the arrival of the decedent at his place of employment, and we are not allowed to "speculate" money out of the respondent's pocket, as was said in the Kramerman case (*Kramerman* v. *Simon*, 131 *N. J. L.* 250; 36 *Atl. Rep.* (*2d*) 132).

The petitioner having failed to prove his allegations by a

preponderance of evidence, as required, the prayers of both petitioners are denied and the petition filed by the decedent, and the petition filed by the widow, are hereby dismissed and judgment final entered in favor of the respondent.

HARRY S. MEDINETS,
*Deputy Commissioner.*